U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

DEC 15 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| M. J. FARMS, LTD. d/b/a LOUISIANA DELTA PLANTATION and MARK HERRON | CIVIL ACTION NO. 1:08-cv-1829 |
| -vs- | |
| UNITED STATES FISH AND WILDLIFE SERVICE and DALE HALL, IN HIS CAPACITY AS DIRECTOR OF THE UNITED STATES FISH AND WILDLIFE SERVICE | JUDGE DRELL<br><br>MAGISTRATE JUDGE KIRK |

## RULING

Before the Court is the Plaintiffs' Complaint seeking declaratory judgment, an injunction and other equitable relief against the Defendants. We granted an evidentiary hearing to determine the propriety of granting a requested preliminary injunction, as well as to consider the threshold issue of subject matter jurisdiction raised by the Defendants. The hearing was held in open court on December 11, 2008, in Alexandria, Louisiana. Both parties presented witnesses and evidence. For the reasons stated below, after careful review of the evidence presented at the hearing and after consideration of the parties' memoranda previously filed herein, the Plaintiffs' request for a preliminary injunction is DENIED. However, because we regard the Plaintiffs' claims as serious, in no way frivolous, and, in part, of first impression either in concept or as presented, further explanation is necessary.

1

I. **THE BACKGROUND**

The Plaintiffs are a hunter and a commercial farming operation that leases portions of its farms annually to hunters. The farms at issue consist of roughly 23,000 acres near the town of Jonesville, Catahoula Parish, known as the Louisiana Delta Plantation ("the Delta"). Twenty-seven tenant farmers lease varying plots of land on the Delta for the production of crops—cotton, rice, soy beans, corn, and milo, among others. The Delta is also popular with hunters because it is favorably situated for the hunting of migratory waterfowl making their way south for the winter along the Mississippi Flyway, and which are lured no doubt by the prospect of a Holiday Inn Express, a nice place to rest and get a meal. In late August 2008, before duck season began, farmers on the Delta were alerted to a major Atlantic hurricane that had devastated much of Hispaniola and was headed their way. Accordingly, those whose crops were at a suitable stage of development began harvesting their fields in earnest in an attempt to salvage what would likely be ruined by the storm, by then known as Gustav. Testimony indicated that approximately thirty percent of the crops on the Delta had been brought in by the time the storm's effects were felt in Louisiana. On September 1, 2008, Hurricane Gustav made its landfall in the United States in Terrebonne Parish, Louisiana and travelled North, causing significant damage to wide areas of the state, including Catahoula Parish. Farmers and farm managers on the Delta testified that large portions of crops had been destroyed or rendered unharvestable as a result of wind or flood damage from Gustav. While an additional thirty percent of the crops were harvested in

the weeks after the storm, the remaining forty percent of crops of the Delta's 23,000 acres were determined to be completely unharvestable because of various causes.

The Delta's tenant farmers are in year-long written leases which contain a provision requiring the annual—perhaps twice-annual, depending on the crop—discing of the soil at the conclusion of the harvest in preparation for the next season's planting.[1] Testimony showed that shredding or discing was also a condition of receiving payments under the tenant farmers' crop insurance policies (the purchase of which is generally required by the mortgagee of the farmers' crops).[2] In any event, nearly all of the remaining unharvestable crops were destroyed by shredding and/or discing, ostensibly to qualify the farmers for insurance proceeds and to prepare the fields for the spring planting. However, this process resulted in a greater than usual portion of seeds, beans, or grains on those unharvestable crops being spread upon the ground along with the shredded plant material. In a perfect world, this would not be problematic: but, enter federal wildlife regulations. Federal law strictly prohibits the hunting of migratory waterfowl on land that is determined to be baited or on lands within the "zone of influence" of baited areas.[3] Migratory waterfowl eat seeds, beans, and grains, and are

---

[1] Discing is a process in which a harrowing implement fitted with discs is driven or pulled over fields to prepare them for planting. Annual discing is required of tenant farmers on the Delta so that the field is ready for a new tenant to get in an early crop in the event the former tenant does not renew his lease. Discing in the fall, as opposed to tilling in the spring, was explained to be a prudent and normal farming operation because of the soil conservation benefits from wetter fall soils.

[2] The United States Department of Agriculture's nationwide Boll Weevil Eradication Program also factors into the particular decision to shred cotton crops. Shredding the cotton stalks limits substantially the boll weevil's habitat during its winter dormancy and contributes to reduced numbers of the pest in subsequent seasons.

[3] "The zone-of-influence rule is apparently not a formal, published rule, but a means of ascertaining or describing in practice the extent of a baited area in a given case. [In a particular case, a fish and wildlife agent] testified that he learned about the rule during a training course, and that it

sometimes illegally baited with this fare by the unscrupulous. Although there is clearly NO evidence of unscrupulous or intentional baiting here, federal wildlife agents determined that the field was baited owing to the extra amounts of seed, beans, and grain on various areas of the Delta, and advised both Delta personnel and hunters that they would hunt the Delta—all 23,000 acres of it falling under an amorphous, yet no less off-limits, "zone of influence" surrounding baited areas—at their own peril. Hunting leases were canceled and the Delta lost hundreds of thousands of dollars as the first phase of the 2008 duck season flew by on the calendar. The Plaintiffs instituted their complaint seeking, among other things, a declaratory judgment, injunctive relief against the enforcement decision of the United States Fish and Wildlife Service, and a Fifth Amendment "taking" claim. The Defendants have, contrarily, moved to dismiss the complaint owing variously to the Defendants' sovereign immunity, a lack of subject matter jurisdiction over the issue at hand, or out of deference to the executive agency's discretionary interpretation of its own regulations.

## II. JURISDICTIONAL ISSUE AND STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction. As courts created by statute, they have no jurisdiction absent jurisdiction conferred by statute. Thus, there must be a statutory basis for federal court jurisdiction over [the Plaintiffs'] claims. The party claiming federal subject matter jurisdiction has the burden of proving it exists." *People's*

---

required him to make judgment calls about the scope of a baited area based on common sense and his observation of such factors as the flight patterns of birds." *United States v. Manning*, 787 F.2d 431, 437 (8th Cir. 1986) (citing *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir. 1978)). Agents' testimony in the present case indicates that they learned how to interpret and apply this rule in their training as well.

4

*Nat'l Bank v. Office of Comptroller of Currency*, 362 F.3d 333, 336 (5th Cir. 2004) (citations omitted). The Plaintiffs' amended complaint asserts that jurisdiction is proper in this Court pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551 *et seq.* (2006). The APA, which does not independently confer subject matter jurisdiction, is Plaintiffs' one hope for establishing this Court is a proper forum in this dispute, in that the APA contains an explicit waiver of the sovereign immunity of the United States to be sued. *See id.* § 702 (2006). However, this waiver permits suit by parties "suffering legal wrong because of agency action," *id.*, which is elsewhere limited by Congress to mean only "*final* agency action." *Id.* § 704 (emphasis added). Two conditions must be satisfied for an agency action to be considered final: (1) the action must mark the consummation of the agency's decision-making process; and (2) the action must be one by which rights or obligations have been determined or from which legal consequences will flow. *Peoples Nat'l Bank*, 362 F.3d at 337. On the other hand, "a non-final agency order is one that 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" *Id.* (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

Here the Plaintiffs produced evidence that showed a final agency decision by the United States Fish and Wildlife Service had been made. There was testimony from both sides that agents of Fish and Wildlife's enforcement division went to the property, determined that the Delta was a baited area owing to the shredding and discing of much of the farmland, and warned the Delta's Recreation Manager—Mr. Drew Keeth, who handles the leasing of the property for hunting—that anyone hunting on the baited area

was subject to criminal prosecution. The agents made this determination based on their interpretation of a regulation that provides a clear standard for making such a decision. Because hunting leasing and management on the Delta is a lucrative business, Mr. Keeth and other employees of the Delta locked all hunters out of the property so as to ensure compliance with the federal regulations, as well as to ensure that they themselves were not prosecuted for permitting violations, an admittedly more serious offense. After attempting to bring the agents back out for a more precise determination of which areas were considered baited and which were not, an invitation the agents refused on grounds of departmental policy, and after speaking with an imprecisely yet sufficiently identified agency supervisor located in Jackson, Mississippi, who was similarly unhelpful in resolving the issue, Mr. Keeth and the hunters were simply at a loss for what to do.

They had no "administrative recourse" in the sense that some administrative law judge specializing in federal wildlife management regulations might hear their grievance against the agents' determination, and no board nor supervisory authority to which they might appeal. The cases cited by Defendants in an attempt to rebut a finding of a final agency decision are inapposite, as in each case there was some administrative proceeding that was ongoing at the time of suit or that was available yet not pursued by the complainant prior to filing suit in federal court. There is nothing like that here. The Fish and Wildlife Service could produce no evidence that there were agency procedures in place by which Plaintiffs might appeal the agents' determination. There were two options: do not hunt on the Delta, or hunt on the Delta and face the certainty of federal criminal charges. It is absurd to argue that the only recourse is for each hunter

6

on each individual field to violate the law and challenge as part of his criminal defense the agency's decision that the Delta constituted a baited area in hopes of an acquittal, and then to hope that he will not be charged again for a subsequent violation of the same law based on another agency determination. Under the facts of this case, the baited area determination was clearly a final agency decision for APA purposes. Consequently, this Court may hear the Plaintiffs' equitable claims.

Having determined the threshold issue of jurisdiction, we must look to the standards applicable to federal judicial review of an executive agency's final decision in an APA case. The power to hear a case is not an absolute power to right every wrong. The APA requires that a reviewing court may only hold unlawful those final agency "action[s], findings, and conclusions" determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (2006). "This standard of review is highly deferential. A final agency decision is 'entitled to a presumption of regularity.' While the court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,' and while 'this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.'" *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983) (citations omitted). This "[C]ourt is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Having set forth the standard of review, we look at the applicable regulations and their application by the proper regulatory authority.

## III.   THE FEDERAL WILDLIFE REGULATIONS

In advising the Plaintiffs of their determination that portions of the Delta were baited, Fish and Wildlife agents Kash Shriefer and Philip Siragusa relied on their interpretation of Title 50, Part 20 of the Code of Federal Regulations, treating the matter of migratory bird hunting. The regulations provide, in pertinent part:

> Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No persons shall take migratory game birds:
>
> * * *
>
> (i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:
>> (1) the taking of any migratory game bird, *including waterfowl*, coots, and cranes, on or over the following lands or areas that are not otherwise baited areas—
>>> (i) Standing crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice[.]
>>
>> * * *
>>
>> (2) The taking of any migratory game bird, *except waterfowl*, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the result of a normal agricultural operation.

50 C.F.R. § 20.21 (2007) (emphases added). Of subsections (1) and (2), the first is applicable in this case as it alone addresses waterfowl. (In this region, the second exception is usually applied to doves—and non-waterfowl hunting is not at issue here.) The definitional portion of this regulation provides:

8

> For the purpose of this part, the following terms shall be construed, respectively, to mean and to include:
>
> * * *
>
> (g) Normal agricultural planting, harvesting, or post-harvest manipulation means a planting or harvesting undertaken for the purpose of producing and gathering a crop, or manipulation after such harvest and removal of grain, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.
>
> (h) Normal agricultural operation means a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.
>
> (i) Normal soil stabilization practice means a planting for agricultural soil erosion control or post-mining land reclamation conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture for agricultural soil erosion control.
>
> (j) Baited area means any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them. Any such area will remain a baited area for ten days following the complete removal of all such salt, grain, or other feed.
>
> (k) Baiting means the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them.

50 C.F.R. § 20.11 (2007).

## IV. APPLICATION

At the hearing there was much discussion of the regulations as applied to this case: (1) How does the shredding and discing of a failed, unharvestable, semi-standing crop after planting but before harvesting figure into a regulatory framework that permits migratory waterfowl hunting only when seeds and grain are scattered as a result of

normal planting or normal harvesting? (2) What are normal agricultural practices in the wake of massive hurricane damage? (3) What constitutes normal planting? and (4) What exactly is a normal harvest? Fortunately there are really no factual disputes. The parties simply disagree over the application of the regulations to what happened on the Delta.

The concept of baiting as defined in the regulations is at the heart of this controversy and must be understood. Federal wildlife agents made a determination that the Delta as a whole was baited or within the "zone of influence" of baited areas as a result of the shredding and discing of the unharvestable crops. The definition of baiting is a decidedly broad one: "an area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them." *Id.* § 20.21(j). It is so notoriously broad that hunters and others criminally charged with hunting or permitting the hunting of a baited area often challenge its constitutionality as being overly vague. *See, e.g., United States v. Adams*, 174 F.3d 571, 574–75 & n.2 (5th Cir. 1999) (reversing a criminal conviction on non-constitutional grounds, but collecting examples of courts' uniform agreement on this regulation's constitutionality). Still, it has been noted that "the term 'baited area' is as exact as the subject matter permits." *United States v. Manning*, 787 F.2d 431, 438 (8th Cir. 1986) (citing *United States v. Petrillo*, 332 U.S. 1, 7–8 (1947)).

This broad definition of baited areas would seem to preclude the hunting of migratory waterfowl over all agricultural areas. Yet the Fish and Wildlife Service regulations provide specific exceptions to hunting over arguably "baited" areas so as not

to foreclose the possibility of mixing agriculture and hunting. Hunting is permissible on or over "[s]tanding crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered *solely* as the result of a *normal* agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice." 50 C.F.R. § 20.21(i)(1)(i) (2007) (emphases added). "Solely" and "normal" are the interpretive keys to this whole case. "Solely" means nothing other than that which is listed. Thus, for the Plaintiffs to prevail, the shredding and discing of crops after a normal planting but before a normal harvest must be considered to be a "normal agricultural harvest."[4] According to the regulations, normal is to be defined by "State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture." *Id.* § 20.11(g), (h), (i). Mr. Ron Levy, the Louisiana State University researcher, whose official title is "State Extension Specialist of the Cooperative Extension Service of the U.S. Department of Agriculture," testified that the shredding and discing of a standing crop, failed or not, is not a normal agricultural harvest. A normal agricultural harvest is what average persons think of when they think of harvest, and what the federal regulations envision in defining normal agricultural harvest: "harvesting undertaken for the purpose of producing and gathering a crop." *Id.* § 20.11(g). After Hurricane Gustav, crops which were unharvestable were shredded and

---

[4] While arguments were advanced at the hearing attempting to equate a post-planting, but pre-harvest, discing and shredding of unharvestable crops with a normal planting or a normal harvest or normal soil stabilization or any other possible exception under the regulation, none of these were plausible and are not considered here. The Court, however, honestly appreciates these earnest undertakings in the cause of zealous advocacy.

11

disced back into the earth from whence they came; nothing was produced and nothing was gathered. In *Adams*, the Fifth Circuit noted the black or white characteristic of this regulation, albeit in the criminal context of the exception in subsection (2): "Indeed, there are many agricultural operations or procedures besides those involving "planting or harvesting." In those instances, the "normal agricultural planting and harvesting" exception, by its very terms, cannot apply." *Adams*, 174 F.3d 571, 577. It is no different here. There is neither planting nor harvest, in which case the exception, "by its very terms," cannot apply.[5]

Several witnesses' testimony shed more light on this seemingly inconsiderate hunting regulation with regard to the exigencies of agricultural practice. During a normal agricultural harvest, combines or other modern crop-gathering implements leave precious little of the crop behind, but enough residuum of potential feed to where a field could arguably be considered a baited area. Wanting to strike a balance between the regulations and the promotion of recreational duck hunting, and to avoid the exclusion of hunters from hunting in agricultural areas that have been harvested, the Fish and Wildlife Service excepts areas where seeds and grains are scattered after a normal harvest. Comparing those allowances with what happened in this case–whole crops, with seeds, beans, and grains still on the plants, often in dense clusters, knocked to the ground ungathered, their produce broadcast over the surface by a shredder or tilled shallowly into the earth by a discer–the difference is significant.

---

[5] Though this Court does not apply it, we are reminded of the canon *expressio unius est exclusio alterius*.

Witnesses for both parties also testified that the fall of 2008 was an exceptional one with regard to the number of waterfowl that had migrated to the Delta—and both parties have suggested unusually plentiful food as one likely explanation (the other being the flocking of a highly gregarious species fleeing the predation of hunters on adjoining properties uninfluenced by baiting). In light of this reality, it is not unreasonable for the regulations to refuse to except the agricultural practice involved here (regardless of its necessity from a production standpoint) from its general rule prohibiting the hunting of waterfowl over baited areas. In other words, in the eyes of the Fish and Wildlife Service minimal baiting is inevitable, but the agency must draw lines at the extremes.

Keeping in mind our required arbitrary and capricious standard of review in this case, we conclude: "[A]fter our careful study of the record, we must take a step back from the agency decision. We must look at the decision not as the chemist, biologist or statistician [or, we might add, federal wildlife enforcement agent] that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983) (citations omitted). The agency's interpretation may seem unduly harsh: Any post-planting natural disaster that prevents the gathering of a normal harvest, insects, disease, or severe weather, will—where farmers are required to shred and disc their fields—operate to render all land within that field's "zone of influence" a baited area where hunting waterfowl is off limits. Still we cannot say that the regulations on baiting were

13

unreasonably interpreted nor unreasonably applied in this case by agents of the Fish and Wildlife Service, who found and testified to substantial evidence of baiting as understood by the regulations they administer. The Court has no power to rewrite executive regulations which have some vagaries subject to interpretation by the agency, especially where, as here, man's rules attempt to govern nature's unpredictable romance. Under the Court's limited rights of review it is not for this Court to upset this executive agency's reasonable interpretation and application of its own regulations, particularly in this unusual, catastrophic storm-related, situation. Accordingly, we cannot say that this ruling could be interpreted as applying beyond the 2008-09 waterfowl hunting season.

## V. CONCLUSION

For the reasons stated above, and after careful review of the evidence presented at the hearing and after consideration of the parties' memoranda previously filed herein, the Plaintiffs' request for a preliminary injunction is DENIED; additionally, the Plaintiffs' various requests for declaratory relief as listed in their complaint are DENIED.

The claims for an alleged unconstitutional temporary taking were not addressed in the hearing nor to date. Accordingly they will, for now, survive dismissal. However, in light of this ruling, counsel for Plaintiffs must advise the Court within fifteen (15) days whether Plaintiffs intend to pursue those claims.

SIGNED on this _15_ day of December, 2008 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE